## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:09cv044

LUCILLE FLACK,                          )
                                        )
            Plaintiff,                  )
                                        )        **MEMORANDUM OF**
            vs.                         )        **DECISION AND ORDER**
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
            Defendant.                  )
_____         )


**THIS MATTER** is before the Court on the Plaintiff's Motion for Summary

Judgment [Doc. 7] and the Defendant's Motion for Summary Judgment [Doc.

11].

## I.    PROCEDURAL HISTORY

The Plaintiff Lucille Flack filed an application for a period of disability

and disability insurance benefits on August 5, 2000, alleging that she had

become disabled as of February 28, 2000  [Transcript ("T.") 65].   The

Plaintiff's application was denied initially and on reconsideration.  [T. 32-35,

42-43].  A hearing was held before Administrative Law Judge ("ALJ") Gregory

Wilson on August 31, 2006.  [T. 577-616].  On October 23, 2006, the ALJ

issued a decision denying the Plaintiff benefits.  [T. 18-28].  The Appeals

Council accepted additional evidence and added it to the record, but denied the Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner.  [T. 7-9].  The Plaintiff has exhausted all available administrative remedies, and this case is now ripe for review pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, see Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  The Court does not review a final decision of the Commissioner de novo.  Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. § 405(g).  The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986)

(quoting <u>Perales</u>, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below.  <u>Hays</u>, 907 F.2d at 1456; <u>Lester v. Schweiker</u>, 683 F.2d 838, 841 (4th Cir. 1982).

## III.    THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process.   20 C.F.R. §§ 404.1520, 416.920.   If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied.  <u>Pass v. Chater</u>, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant. 20 C.F.R. §§ 404.1520, 416.920. Second, the claimant must show a severe impairment.  If the claimant does not show any impairment or combination thereof which significantly limits the claimant's physical or mental ability to perform work activities, then no severe impairment is shown and the claimant is not disabled. <u>Id.</u>  Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the claimant is disabled regardless of age, education or work experience.

Id.  Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of work done in the past.  If the claimant can still perform that work, then a finding of not disabled is mandated.  Id.  Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work.  If so, then the claimant is not disabled.  Id. In this case, the ALJ's determination was made at the fifth step.

## IV.    FACTS AS STATED IN THE RECORD

The Plaintiff was 57 years old at the time of the ALJ's hearing.  [T. 65, 581].  She is married with two grown sons.  [T. 581, 588].  The Plaintiff has a B.S. in education, and her past relevant work was in teaching middle grades. [T. 581-2].  The Plaintiff testified that she stopped working in March 2000 due to pain in several locations.  [Id.].

The medical evidence of record reveals that in 1997, prior to her alleged onset date, the Plaintiff was involved in a motor vehicle accident, after which she experienced pain in her low back and coccyx area.  She sought chiropractic treatment and underwent some epidural injections.  [T. 525-552]. From March 2000 to October 2000, the Plaintiff saw Stephen Saleeby, D.C.,

a chiropractor, for neck pain, headaches, and low back pain. After testing, he diagnosed her with post-traumatic sprain/strain syndrome of the cervicothoracic and lumbar spines resulting in cervicobrachial and cervicocranial syndromes, complicated by multiple levels of vertebral subluxations. She received frequent treatments, and was noted as progressing "slowly but steadily" at every appointment. At her last recorded appointment, it was noted that she was "progressing well." [T. 424-429].

In September 2001, the Plaintiff underwent a consultative examination with Dale Mabe, D.O. Dr. Mabe noted that the Plaintiff had full range of motion in all areas, 5/5 muscle strength in all extremities, 5/5 grip strength, normal squatting ability, and a steady gait. The Plaintiff reported that she had to use a cushion due to pain in her coccyx but that she could sit for 1 1/2 hours and stand and walk for 1/2 hour each due to bilateral foot pain. The Plaintiff further reported that she could drive for one hour and use her hands for fine motor activities without difficulty. She denied having any symptoms of depression, anxiety or nervousness. Dr. Mabe diagnosed the Plaintiff with status post coccyx injury with continued problems and bilateral foot pain with scar, post Morton's neuroma surgery, which prevented her from standing or walking for prolonged periods of time. [T. 270-73].

The Plaintiff reports a history of pain in her feet, due to Morton's

neuromas. [T. 582]. The Plaintiff testified that she underwent surgery to address these neuromas in 1995, but that surgery was unsuccessful. She testified that she has had difficulty walking since the surgery. [T. 582]. The medical evidence of record indicate that the Plaintiff began seeking treatment for her foot pain in November 1995 from Lowell H. Gill, M.D. at the Miller Orthopaedic Clinic. Dr. Gill's records indicate that the Plaintiff had seen a podiatrist for two years and that her condition had been "managed quite successfully with Cortisone injections," but that the injections were no longer effective. Dr. Gill noted normal x-ray findings, determined that further surgery was not advised, and recommended a different orthotic for her shoes. In January 1996, the Plaintiff reported that the change in orthotics, along with weekly massage, and medications[1] had reduced the swelling and decreased her pain. [T. 183-6].

Dr. Gill also treated the Plaintiff for back and coccyx pain resulting from her 1997 motor vehicle accident. At a visit in November 1997, Dr. Gill noted that he did not feel that surgical intervention was warranted. He recommended that she continue with her current activities and use a soft cushion for sitting. Dr. Gill noted that he expected the Plaintiff's symptoms to

---

[1]The Plaintiff reported using Elavil and Prednisone provided to her "by a family friend." [T. 184].

"resolve uneventfully over the next 6 to 8 weeks." [T. 185].

An MRI of Plaintiff's lower back on October 21, 1998 showed mild bulging of the intervertebral disc at L4-5 and L5-S1, but no evidence of focal disc herniation. [T. 208]. On November 17, 1998, Dr. Gill released Plaintiff at maximum medical improvement with a 5% permanent partial disability to the whole body. [T. 188].

The Plaintiff began seeking treatment from Neal S. Taub, M.D. in February 1999, for persistent coccygeal area pain. He recommended a series of acupuncture treatments, which were tolerated well. [T. 210-11]. At a visit with Dr. Taub in September 2000, the Plaintiff noted that chiropractic treatment and use of a TENS unit were "quite helpful." [T. 224]. In December 2000, she indicated that acupuncture continued to give good pain relief, but that she still used pain medication occasionally. [T. 228]. In February 2001, Dr. Taub noted his opinion that Plaintiff's chronic lumbar and coccygeal pain rendered her totally and permanently disabled. [T. 232].

In July 2002, the Plaintiff presented to Dr. Robert Anderson of OrthoCarolina, complaining of bilateral foot discomfort and chronic tingling in her toes. Upon examination, Dr. Anderson noted that the Plaintiff was in no apparent distress and had a normal gait and stance. He further noted that the tingling was to be expected after a Morton's neuroma resection. Dr. Anderson

opined that Plaintiff's choice of shoes and her current orthotic device were possible causes of her problems. Dr. Anderson stated that he did not believe Plaintiff's condition to be a progressive or severe condition requiring aggressive treatment modalities. [T. 523-4].

In February 2003, the Plaintiff was evaluated by Dr. Leon Dickerson of OrthoCarolina for coccydynia. She described her pain as considerable, present most of the time, and that it prevented her from doing many things she wants to do. She reported taking Vicodin sparingly for pain. Dr. Dickerson noted that the Plaintiff walked without a limp, and that while her back and sacrum were non-tender, her coccyx was quite tender on palpation. X-rays showed a type I coccyx. Dr. Dickerson recommended surgery to address the coccydynia. [T. 521-2]. Surgery was performed to remove the Plaintiff's coccyx in March 2003. [T. 518, 564-66].

At two months post-surgery, Dr. Dickerson noted that the Plaintiff was "making slow but gradual improvement" and recommended increasing her activities to include physical therapy, pool exercises, and massage therapy. [T. 512-4].

In June 2003, the Plaintiff underwent several physical therapy sessions consisting of deep tissue neuromuscular massage for symptoms of coccyx pain. [T. 562-63]. Also in June 2003, Dr. Dickerson gave the Plaintiff two

ischial turbosity injections due to bursitis.  At that time, the Plaintiff reported that despite her pain, she was able to remain fairly active.  [T. 511].

During a visit in September 2003, the Plaintiff reported to Dr. Dickerson that she was "better but was "not well."  He declined to perform an exam or give her further shots, and assured her he saw "nothing here to worry about." [T. 509].  In December 2003, she reported to Dickerson that she was perhaps ten to twenty percent better.  She reported still experiencing some foot pain, but also reported having more energy.  She further reported doing a home exercise program but that when she "does too much" she "crashes and burns."  Dr. Dickerson performed no exam at that time, and indicated that in three months she could just call in her condition rather than coming in for a visit.  [T. 510].

One year later, Plaintiff was seen again by Dr. Dickerson, complaining of continued chronic tailbone pain.  Dr. Dickerson noted that he really had nothing to offer her beyond what Dr. Taub was doing, other than prescribing Lidoderm patches.  He further noted: "I do not feel that she has anything serious and activity can be done as tolerated."  [T. 507].

In January 2005, Plaintiff initiated lymph drainage therapy with Marilyn Mathews, LMBT.  Ms. Mathews observed extreme lymphatic congestion in Plaintiff's clavicles, neck, face, and underarms.  She advised Plaintiff to drink

lots of water and rest after the therapies. Records indicate that Plaintiff responded well to therapy. On March 23, 2005 and December 21, 2005, she reported being very tired from "doing too much." Low energy, pain in her right elbow and her feet, and continuous rapid breathing were noted several times. Other than the inability to walk for exercise, or to do other forms of exercise, no limitations were specified in notes spanning from January 2005 through June 21, 2006. [T. 494-503].

In 2005, Plaintiff again returned to physical therapy with severe pain due to Morton's neuromas. She reported that recent attempts at treatment, including alcohol injections to decrease nerve pain and new orthotics, offered minimal benefit. Plaintiff's range of motion and manual muscle testing showed full functional limits for bilateral ankles and feet. A plan of care for e-stim, ultrasound, soft tissue mobilization, and home exercise program was developed. [T. 355]. She received two months of ultrasound treatments to her feet and elbows, experiencing slight improvement for her feet and much improvement for her elbows. She was discharged from physical therapy as "maximum potential attained" in March 2005 [T. 347-354].

Beginning in May 2005, the Plaintiff was seen by neurologist Dr. Hemanth Rao for complaints of pain and tingling/numbness in her feet. Dr. Rao conducted EMG/NCV studies that documented abnormalities consistent

with bilateral tarsal tunnel syndrome.  [T. 436-38, 443-50].

On August 4, 2005, Plaintiff visited Dr. Robert Anderson of OrthoCarolina for evaluation of her foot pain.  On examination, Dr. Anderson noted that Plaintiff exhibited a normal gait, fat pad atrophy discomfort, abnormal sensation, and equivocal Tinel's sign, but that otherwise findings were normal.  [T. 504].  X-rays of both feet were normal.  Dr. Anderson diagnosed Plaintiff questionable bilateral tarsal tunnel syndrome with tibial neuritis, chronic metatarsalgia of bilateral feet, and chronic pain syndrome.  Dr. Anderson noted that Plaintiff was a poor surgery candidate because of her symmetric presentation and lack of a space-occupying lesion.  He therefore recommended nonoperative modalities, including a trial of Neurontin and metatarsal pads.  He further referred her to the Southeast Pain Service to address her chronic pain.  [T. 504-6].

In 2005, Dr. Taub prescribed a series of infrared light therapy treatments to address her chronic foot pain.  The Plaintiff reported receiving some relief from these treatments, but they did not provide permanent relief.  [T. 330-32].  The Plaintiff also continued to see Dr. Taub for acupuncture treatments, as well as undergoing physical therapy for neck and right shoulder pain.  In August 2006, the Plaintiff underwent a nerve conduction study, which was normal.  [T. 283-319].

Regarding the Plaintiff's mental health, throughout 2000 and 2001, the Plaintiff also saw Susan Sihler, MSW, LCSW, BCD, for counseling to address issues of dysthymia (a chronic type of depression) and pain. [T. 276-77]. On September 26, 2001, Ms. Sihler opined that the Plaintiff could not return to her previous employment as a teacher due to her pain level and her difficulty in sitting or standing for long periods of time. [T. 277].

In February 2002, the Plaintiff saw Louise Friedlander, Ph.D., for a consultative psychological examination. The Plaintiff reported to Dr. Friedlander that she was able to clean her house, cook light meals, attend pool therapy 2-4 times per week, attend choir practice on Wednesdays, and sing in the church choir on Sundays. Upon examination, Dr. Friedlander noted that the Plaintiff had good reality contact, that her motor activity was not grossly impaired, that she was very positive, and that she was alert and responsive to the evaluation process. She further noted that the Plaintiff's speech was clear and of normal rate and production, that she described a healthy range of affect, and that she made good eye contact. Dr. Friedlander noted that she appeared coherent and goal directed, had no unusual preoccupations, and did not appear to be distracted. She further noted that the Plaintiff was oriented to time and placed and appeared to have above average intellectual functioning. Dr. Friedlander indicated in her report that

the Plaintiff was able to learn and perform simple, routine, and repetitive tasks, was skilled at interacting with peers and co-workers, and could respond appropriately to supervision. Dr. Friedlander opined, however, that she would have difficulty maintaining concentration and pace due to her reported symptoms of depression and pain. [T. 278-82].

The Plaintiff also saw Martha Smith, M.D. every six months for treatment of major depressive episode and anxiety. In November 2004, Dr. Smith noted that the Plaintiff exhibited mild symptoms and noted that she had gained some weight. In May 2005, the Plaintiff reported that she had just been on a pleasant trip to Jamaica. Dr. Smith characterized her condition as "mild" and refilled her prescriptions for Elavil, Klonopin, and Ambien. In November 2005, the Plaintiff reported that she had experienced some difficulties with concentration, but that she continued to have a good appetite and was able to sleep. She further reported being very active with her church, having taken on some larger projects there, and that she had received recognition from higher-ups in her church. [T. 255-61, 322-26]. In August 2006, Dr. Smith completed a medical source statement indicating that the Plaintiff was unable to meet competitive standards in several areas of mental functioning. [T. 320-21].

At the ALJ hearing, the Plaintiff testified that she is able to drive, that

she watches six to seven hours of television per day, attends church on Sundays, sings in the church choir, attends choir practice on Wednesdays, and can perform basic household chores. Additionally, the Plaintiff stated that she had gone on vacations to New York, the Bahamas, and Jamaica, and that she is able to shop and to go to dinner with friends. [T. 581-606].

## V.    THE ALJ'S DECISION

On October 23, 2006, the ALJ issued a decision denying the Plaintiff's claim. [T. 18-28]. Proceeding to the sequential evaluation, the ALJ found that the Plaintiff's date last insured was December 31, 2005 and that she had not engaged in substantial gainful activity since her alleged onset date of February 28, 2000. [T. 20]. The ALJ then found that the medical evidence established the following severe impairments: degenerative disk disease of the cervical sine with right shoulder radiculopathy; bilateral foot pain, status post Morton neuroma excisions (1995), status post coccygectomy surgery (2003) with ischial tuberosity bursitis; and bulging disks of the lumbar spine/low back pain. [T. 21]. He found the Plaintiff's anxiety, depression and headaches to be non-severe. [T. 23-4]. The ALJ determined that none of Plaintiff's impairments met or equaled a listing. [T. 18].

The ALJ then assessed the Plaintiff's residual functional capacity, finding that the Plaintiff has the ability: to lift and carry 20 pounds occasionally

and 10 pounds frequently; to sit, stand, and walk six out of eight hours with a sit-stand option every 40 minutes; to push and pull occasionally; to climb, stoop, kneel, crouch, and crawl frequently; to balance occasionally; to perform 3-4 step tasks; and never to climb or work around hazards. [T. 24]. He then determined that Plaintiff was unable to perform any past relevant work. [T. 26]. Finding that Plaintiff had acquired work skills from her past relevant work, the ALJ obtained vocational expert testimony to determine whether any work existed that used those skills and no additional skills, whereupon he found that the Plaintiff could perform other work in the national economy. [T. 27]. He found that Plaintiff therefore was not "disabled" as defined by the Social Security Act from the alleged onset date of February 28, 2000. [T. 28].

## VI.    DISCUSSION

The Plaintiff asserts five assignments of error. First, the Plaintiff argues that the ALJ erred in concluding that her chronic depression and anxiety were not severe impairments. Second, the Plaintiff contends that the ALJ erred in that his evaluation of Plaintiff's subjective complaints and credibility was inconsistent with SSR 96-7p. Third, the Plaintiff argues that the ALJ erred in rejecting the opinions of two treating physicians and one treating mental health therapist. Fourth, the Plaintiff contends that the ALJ erred in assessing her residual functional capacity. Finally, the Plaintiff argues that the ALJ failed

to comply with SSR 00-4p in failing to resolve conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles (DOT). The Court will address each of these issues in turn.

## A. Substantial evidence supports the ALJ's determination that Plaintiff's anxiety and depression were not severe.

At step two of the sequential evaluation, the burden is on the claimant to show the existence of a medically determinable impairment that is severe. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The Regulations explain that "[a] non-severe impairment is an impairment or combination thereof that do(es) not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a). The Fourth Circuit has held that an impairment is "non-severe" if it "has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

In finding that the Plaintiff's anxiety and depression were not severe, the ALJ relied upon the Plaintiff's specific denial of these conditions to Dr. Mabe during an evaluation ordered by Disability Determination Services (DDS). He also cited the litany of activities and accomplishments that she described to Dr. Friedlander, as well as Dr. Friedlander's objective observations of her mood, affect and mental status. [T. 22-3]. Plaintiff's subjective reports and

these objective findings of record are substantial evidence to support the ALJ's determination that the Plaintiff did not experience "significant" limitations as a result of these conditions. The Plaintiff's first assignment of error, therefore, is without merit.[2]

## B. The ALJ properly assessed the Plaintiff's subjective complaints under SSR 96-7p.

Social Security Ruling 96-7p emphasizes that

> [w]hen the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

---

[2]Even if the Court were to conclude that the ALJ erred in not finding the Plaintiff's anxiety and depression to be severe, such error was harmless. The ALJ's decision reflects that he considered the conditions at step three of the sequential evaluation, noting that only mild "B" criteria limitations existed. [T. 24]. Furthermore, he included a limitation to 3-4 step tasks at step four of the sequential evaluation. [T. 24]. Though his stated basis for this limitation was pain, such limitation is also consistent with his own finding of mild "B" criteria limitations. It is also consistent with Dr. Friedlander's finding that "[t]he claimant is cognitively able to learn and perform simple, routine and repetitive tasks. She would be skilled at interacting with peers and coworkers and would be able to respond appropriately to supervision. She would have difficulty maintaining concentration and pace due to her residual symptoms of depression and her ongoing experience of pain." [T. 281]. An error that had no practical effect on the outcome of the case is not cause for reversing the Commissioner's decision. DeWalt v. Astrue, 2009 WL 5125208 (D.S.C. 2009) (citing Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir.1987)).

SSR 96-7p at *1.

Having found that the Plaintiff had severe impairments that reasonably could be expected to cause pain, the ALJ then devoted three pages of his opinion to evaluating how the intensity and persistence of such pain and other symptoms affected her ability to work. [T. 25-6]. Specifically, he found that the Plaintiff has no side effects from medications that address her symptoms, that she takes no narcotic pain medications,[3] and that she performs a wide array of physical activity. Each of these findings are well-supported by the record. The ALJ also found it significant that Dr. Dickerson noted on more than one occasion that Plaintiff had no significant problems. Dr. Dickerson's disinclination to further examine her or have her visit in person further suggests her condition was not as severe as she claimed. The conservative, non-invasive nature of most of her treatment modalities also supports this conclusion.

No symptom or combination of symptoms can be the basis for a finding of disability, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental

---

[3]Contrary to Plaintiff's assertion [Doc. 8 at 24], the ALJ did note that Plaintiff used Neurontin, a non-narcotic medication, for pain. [T. 25]. Also, Plaintiff's record of claiming drug "allergies" to "all narcotics" and "all anti-inflammatories," is inconsistent with her allergists' notes and with her own behavior of requesting such drugs at other times. [T. 451-73]. This suggests a pattern of medical non-compliance with available effective therapies, further reducing her credibility on the issues of pain and symptoms.

impairment(s) that could reasonably be expected to produce the symptoms. SSR 96-7p at *1. As the ALJ noted, nearly all of the medical records submitted include more than one notation of Plaintiff's high activity level and/or her choosing to do more activity in spite of their recommendations to slow down. The Plaintiff even developed an over-use injury, lateral epicondylitis, during the period of alleged disability. Also contradictory to her claims of disability were the notable successes she achieved within her consistently busy lifestyle.

Compliance with treatment recommendations such as medication dosing, therapies and activity limitations is necessary to establish disability. McKenney v. Apfel, 38 F.Supp.2d 1249, 1259 (D. Kan. 1999) (citing Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991)); see also Benson-White v. Astrue, 2009 WL 2988694 (D.S.C. 2009). Plaintiff's consistently exacerbating her own reported symptoms by doing more than she claims she was able to, both diminishes her credibility in asserting limitations from those symptoms and indicates her repeated noncompliance with medical treatment.

This Court may not respond to Plaintiff's challenge to the substantiality of evidence by "re-weigh[ing] conflicting evidence, mak[ing] credibility determinations, or substitut[ing its] judgment for that of" the agency. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (alteration in original). "Because

he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). For the reasons stated above, the Court concludes that the ALJ's assessment of Plaintiff's subjective symptoms followed applicable law, and that his credibility determination was supported by substantial evidence.

### C. The ALJ properly weighed the medical source opinions of record.

Next, the Plaintiff argues that the ALJ erred in rejecting the opinions of certain of her treating medical care providers. Specifically, she argues that the ALJ erred in disregarding the disability opinions of Dr. Smith and Dr. Friedlander, as they are the opinions of treating physicians and therefore entitled to controlling weight. She further argues that the ALJ erred in rejecting the disability opinion of Dr. Taub in favor of the opinion of Dr. Dickerson, when she had a longer and more involved treatment relationship with Dr. Taub. The Plaintiff further argues that the ALJ erred in attributing no weight to Susan Sihler's opinion under the medical source rule.

> The Secretary has provided guidelines for evaluating medical opinions regarding impairments and disability in regulation 20 C.F.R. § 404.1527. These ask the fact-finder to weigh: (1) the examining relationship (more weight to an examining than a non-examining physician); (2) the treating relationship (more weight to treating than consultative sources); (3)

> supportability (whether the report is based on detailed
> findings or merely conclusory); (4) consistency
> (internally and compared to the record as a whole);
> (5) specialization (whether the source is board
> certified or whose qualifications are suspect); and (6)
> "other factors" (unspecified).

See Vest v. Astrue, 2009 WL 899418, at *5 (S.D.W.Va. 2009).  A treating

source's opinion on the issues of the nature and severity of a claimant's

impairment is entitled to controlling weight, as long as such opinion is

well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in the

record.  20 C.F.R. § 404.1527(d)(2).

The ALJ found that Dr. Friedlander's opinion was entitled to no weight

because her opinion was based on Plaintiff's subjective complaints and was

not supported by medically acceptable clinical and laboratory diagnostic

techniques.  Contrary to the Plaintiff's argument, it was not error for the ALJ

to refuse to give Dr. Friedlander's opinion controlling weight.  The record

shows that Dr. Friedlander's opinion was not the result of an extended treating

relationship but rather of a one-time consultative examination.  The record

further shows that Dr. Friedlander's opinion was not based on objective

clinical and laboratory diagnostic techniques, but rather relied on the Plaintiff's

subjective claims.  As the ALJ properly determined the Plaintiff to be not

entirely credible, the ALJ properly discounted the weight attributable to Dr.

Friedlander's opinion due to its reliance on the subjective information provided by the Plaintiff.

The ALJ further did not err in attributing no weight to the disability opinion provided by Dr. Smith. The record reveals that Dr. Smith saw Plaintiff just twice per year, albeit for eight years. These appointments were largely confined to evaluation of psychotropic medications, and resulted in mere quarter-page encounter records. With the exception of one reference to the Plaintiff experiencing "moderate" symptoms, Dr. Smith consistently classified the Plaintiff's mental symptoms as "mild" and well-controlled by medication. Dr. Smith's notes further include several references to the Plaintiff's activities and achievements. As the ALJ correctly found, these records do not support the severity of limitations noted by Dr. Smith, and therefore the ALJ properly discounted her opinion.

The ALJ rejected Dr. Taub's disability opinion on two grounds. First, the ALJ noted that Dr. Taub's finding of the severe limitations was "based significantly on the [Plaintiff's] subjective complaints of pain which are found to be exaggerated in light of her ability to engage in such a wide variety of activities." [T. 26]. Further, the ALJ noted that Dr. Taub's opinion was inconsistent with the findings of Dr. Dickerson, who performed the surgery to remove the Plaintiff's coccyx and therefore "was in a better position to

evaluate the effects of the claimant's coccyx resection." [Id.].

As the coordinator of Plaintiff's care, Dr. Taub performed the role of primary treating physician, but he personally performed only acupuncture. Dr. Taub offered a conclusory, three-sentence disability opinion. Further, as the ALJ noted, his disability opinion lacks support in the objective findings of record. Even the opinion of a primary treating physician must be supported by objective signs and findings and must comport with the record as a whole. See 20 C.F.R. § 404.1527(d)(2). Finally, as Dr. Dickerson is a specialist in orthopedics, and a treating physician over approximately one year for Plaintiff's coccyx condition, his opinion earns equal or greater weight than Dr. Taub's on the subject. The ALJ did not err in disregarding Dr. Taub's disability opinion.

Finally, the Plaintiff takes issue with the ALJ's evaluation of Ms. Sihler's opinion. As a mental health therapist who treated the Plaintiff frequently during the course of 16 months, Ms. Sihler would qualify to provide an opinion regarding the Plaintiff's mental limitations as a proper "other medical source" pursuant to Social Security Ruling 06-03p. Ms. Sihler's opinion letter, however, addresses only physical limitations, which are not within her realm of expertise and in any event are not supported by the necessary objective findings. As such, the ALJ properly discounted Ms. Sihler's opinion.

For these reasons, the Plaintiff's third assignment of error is overruled.

**D.  The ALJ's analysis of Plaintiff's residential functional capacity complied with SSR 96-8p.**

Next, the Plaintiff argues that the ALJ inaccurately summarized the medical evidence and made a conclusory statement of her Residual Function Capacity (RFC) without any supporting rationale.

SSR 96-8p emphasizes that

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.... The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms.

SSR 96-8p at *1.  The RFC assessment must be based on all of the relevant evidence in the case record.  Id. at *5.

The record contains little objective, uncontradicted evidence regarding the Plaintiff's ability to perform strength-based, non-exertional or mental work activities.  As noted previously, the Plaintiff's testimony on these issues was properly assessed as not entirely credible, because the record is replete with her reports of regular activity and accomplishments beyond her claimed limitations.  Nevertheless, the Plaintiff asserts that the ALJ failed to make a function-by-function analysis of her capabilities as required by SSR 96-8,

which requires that an ALJ's decision describe "the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."

Contrary to the Plaintiff's argument, however, the ALJ did provide the maximum amount of time Plaintiff could perform her non-exertional limitations, as he noted that she could frequently climb, stoop, kneel, crouch, crawl, and reach; occasionally balance; never climb ladders, ropes, and scaffolds; and perform no more than three to four step tasks [T. 24]. The ALJ also determined the maximum amount of time that Plaintiff could perform with respect to environmental factors, as the ALJ provided that she could never work around hazards [Id.]. To the extent that the Plaintiff argues that the ALJ failed to provide the maximum amount of time that she could perform other nonexertional activities, Plaintiff's argument is without merit, as the ALJ did not find that she had limitations in any other activities. The ALJ's RFC assessment correctly excluded limitations identified by her treating physicians, since the ALJ properly rejected those opinions, as previously discussed. See Jones v. Astrue, 500 F. Supp. 2d 1277, 1290 (D. Kan. 2007) (concluding that ALJ correctly excluded limitations from RFC assessment based on rejected opinions). For these reasons, the Court concludes that the ALJ properly provided a function-by-function assessment of Plaintiff's ability to work.

Next, the Plaintiff contends that the ALJ did not consider whether she could sustain her RFC for 8 hours per day, 5 days per week, as required by SSR 96-9. By definition, however, RFC contemplates that an individual will sustain that capacity for 8 hours per day, 5 days per week. <u>See</u> SSR 96-8p (RFC is ability to do sustained work activities on regular and continuing basis, defined as "8 hours a day, for 5 days a week"). Thus, the ALJ's finding that Plaintiff retained the RFC for a range of light work was a determination that she could sustain that capacity for 8 hours per day, 5 days per week. The ALJ properly assessed Plaintiff's RFC.

### E. No conflict existed between the vocational expert's testimony and the Dictionary of Occupational Titles.

Finally, the Plaintiff argues that the ALJ's inclusion of a sit/stand option in his hypothetical question created a conflict requiring resolution under SSR 00-4p because the Dictionary of Occupational Titles (DOT) does not address sit/stand options in its job listings. She also argues that the ALJ's failure to obtain the DOT numbers for jobs identified by the vocational expert (VE) was error.

Social Security Ruling 00-4p, upon which Plaintiff relies, governs how an ALJ may use vocational expert testimony:

> When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on

the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p at *4.

In the present case, the ALJ asked the vocational expert to identify any conflicts between his testimony and the DOT, and he specified that there was no conflict. [T. 612]. Plaintiff's counsel was active in the examination of the expert and could have raised any conflict that he saw, but did not. The ALJ was entitled to rely on the vocational expert's opinion on this issue. See Moffett v. Apfel, 2000 WL 1367991 at *8 (S.D. Ala. 2000). Because there was no indication in the record that a conflict existed, the ALJ did not err by failing to request further substantiation from the vocational expert.

The Plaintiff next argues that the ALJ erred in failing to obtain the DOT numbers corresponding to what she notes are the very broad job categories "general clerical" and "file clerk." In so arguing, the Plaintiff does not contest the "food management aide" job also identified by the vocational expert. As there are 7,667 such jobs in North Carolina and over 295,000 nationwide, that job alone is substantial evidence supporting the ALJ's reliance on the vocational expert's testimony. In any event, the Plaintiff makes no attempt to show how she was prejudiced by the vocational expert's failure to provide the

corresponding DOT numbers for the jobs identified. For these reasons, the Court concludes that this argument is without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ applied the correct legal standards, and that there is substantial evidence to support the ALJ's finding of no disability from the date of onset to the date of his decision.

## O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 7] is **DENIED**; the Defendant's Motion for Summary Judgment [Doc. 11] is **GRANTED**; and the Commissioner's decision is hereby **AFFIRMED**. This case is hereby **DISMISSED WITH PREJUDICE.**

A judgment shall be entered simultaneously herewith.

**IT IS SO ORDERED.**

Signed: August 20, 2011

Martin Reidinger
United States District Judge